IN THE UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| ex rel. | ) | Case No.   6:17-CV-00... |
| | ) | |
| ██████████ | ) | FILED UNDER SEAL |
| | ) | Pursuant to 31 U.S.C. § 3730(b)(2) |
| Plaintiff, | ) | |
| | ) | Jury Demand |
| v. | ) | |
| | ) | |
| CPN BIOSCIENCE, LLC, | ) | |
| KERSDALE HOLDINGS, LLC, | ) | |
| MANDEEP TANEJA, | ) | |
| MUNJU TANEJA, | ) | |
| MIHIR TANEJA, | ) | |
| JUGAL TANEJA, | ) | |
| MISCHIK GROUP, LLC, | ) | |
| ADAM MISCIK, | ) | |
| JAMES D. DAWES, | ) | |
| J. DAWES GROUP, LLC, | ) | |
| BELCHER PHARMACEUTICALS, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

COMPLAINT

COMES NOW, ██████████ Relator), and brings this action on behalf of

the United States of America against CPN BIOSCIENCE, LLC ("CPN"), a Florida corporation

headquartered in Largo, Florida; JAMES D. DAWES, a resident of Sarasota, Florida; the J.

DAWES GROUP, an inactive Florida corporation; KERSDALE HOLDINGS, LLC, a Florida

corporation; MANDEEP TANEJA, a corporate officer and resident of Florida; MUNJU

TANEJA, a corporate officer and resident of Florida; MIHIR TANEJA, a corporate officer and resident of Florida; MISCHIK GROUP, LLC, a Florida corporation; ADAM MISCIK, a corporate officer and Florida resident; and BELCHER PHARMACEUTICALS, LLC, a Florida Corporation; pursuant to the Qui Tam provisions of the Civil False Claims Act, 31 U.S.C. § 3729-33 et seq.; the Federal Anti-Kickback Statute, 42 U.S.C. § l320a-7b(b); the Stark Act, 42 U.S.C. § 1395nn; and the Florida False Claims Act, Fla. Stat. A11n. § 68.081 et seq. The Relator seeks treble damages and civil penalties against Defendants, pursuant to the Federal Civil False Claims Act, 31 U.S.C. § 3729-33 et seq. ("The False Claims Act").

INTRODUCTION

1.      Beginning at a time unknown to the Relator, in the Middle District of Florida and elsewhere, the Defendants, knowingly and intentionally created, funded or engaged in, or directed, or conspired, or combined and agreed to create and engage in, unlawful marketing schemes to sell Nuvagen Collagen Powder, which is classified as an item of Durable Medical Equipment (DME), in violation of the Federal Civil False Claims Act, the Anti-Kickback Statute, the Stark Act, the Florida False Claims Act, Medicare and Medicaid certification requirements and to market and sell Nuvagen Collagen powder for unintended purposes and uses. Such wrongful conduct by the Defendants has occurred throughout United States and continues today.  These unlawful schemes are:

    (a)    encouraging doctors to prescribe Nuvagen Collagen Powder for minor surgical injuries which is not medically necessary nor economically responsible to government healthcare providers like Medicare and Medicaid;

    (b)    establishing a system whereby they facilitate and assist doctors to function as DME providers to make enormous profits from prescribing Nuvagen Collagen Powder;

(c)     encouraging doctors not to collect Medicare co-pays from patients to incentivize patients to return for additional treatment and Nuvagen Collagen Powder prescriptions ; and

(d)     providing free up-front inventory and discounts to doctors for the cost of Nuvagen Collagen Powder so that the doctors can increase their profits.

The Relator has firsthand knowledge of these wrongful and fraudulent schemes. The Relator was and is employed as ████████████████████████ where the Defendants attempted to influence and coerce ███████ these wrongful and fraudulent marketing schemes and to employ other practices, which violated the Federal Civil False Claims Act, the Anti-Kickback Statute, the Stark Act, the Florida False Claims Act, Medicare and Medicaid rules and regulations and Food & Drug Administration rules and regulations. ████████████████████████████████████ ███████████████████████████ the loss to the United States and the state of Florida may be already in the hundreds of millions of dollars.

## JURISDICTION AND VENUE

2.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq. as amended by the Fraud Enforcement Recovery Act of 2009, effective date May 20, 2009, ("FERA"), and the False Claims Act, 31 U.S.C. §§ 3729, et seq. as enacted and enforced before May 20, 2009.  There is also a claim for relief under the Florida False Claims Act, Fla. Stat. A11n. § 68.081 et seq.  This court has jurisdiction over this case under 31 U.S.C. §§ 3732(a) and 3732(b) and 28 U.S.C. § 1345 and 1331. Relators have made voluntary

3

disclosures to the United States Government prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

3.      Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§1391(b) and (c), because at all material and relevant times Defendants transacted business and/or reside in this district.

THE PARTIES

RELATOR: ████████████

4.      ████████████ is an "original source" of the information contained in this document within the meaning of 31 U.S.C. § 3730(e)(4)(R). ██████████ s knowledge the information concerning the Defendants' alleged False Claim violations has not been publicly disclosed.

5.      ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████

DEFENDANT: CPN BIOSCIENCE, LLC

6.      CPN BIOSCIENCE, LLC is a Florida limited liability corporation established in 2015 and has its principle place of business at 6925 112th Street, Suite 102, Largo, Florida 33773. According to the State of Florida Division of Corporations website and corporate documents filed by CPN, the company has two managers: KERSDALE HOLDINGS, LLC and

4

the MISCIK GROUP, LLC. According to the company's website, "CPN is committed to accelerating the science and technology of wound healing by developing innovative products and education programs. We are focused on assisting healthcare professionals and improving each patient's individual journey of healing. Our commitment is to bring innovative solutions to complex problems associated with wound care." www.cpnbio.com. The product CPN wanted the Relator to prescribe to his patients was Nuvagen Collagen Powder ("the Powder"). In promotional materials for the powder, CPN states it is the manufacturer. According to public filings with the Food and Drug Administration, however, BELCHER PHARMACEUTICALS, LLC is responsible for making the powder and the registered manufacturer. The two companies are managed by the same individuals. The Relator was told in July 2017 by a representative for CPN that the company made over $100 million in 2016.

## DEFENDANTS: KERSDALE HOLDINGS, LLC

7.      This is an active Florida company located at 6911 Bryan Dairy Road, Ste. 210, Largo, Florida. Four members of the Taneja family are managers for the company (see below).

## DEFENDANT: MISCIK GROUP LLC

8.      This is an active Florida company located at 37 Channelside Walkway, Unit 1502, Tampa, Florida 33602.

## DEFENDANT ADAM MISCIK

9.     Adam Miscik is a manager for MISCIK GROUP, LLC and resides in the Middle

District of Florida.

## DEFENDANT: MANDEEP TANEJA

10.     Mandeep Taneja is a manager for KERSDALE HOLDINGS, LLC and BELCHER

PHARMACEUTICALS, LLC, and resides in the Middle District of Florida.

## DEFENDANT: MUNJU TANEJA

11.     Munju Taneja is a manager for KERSDALE HOLDINGS, LLC and BELCHER

PHARMACEUTICALS, LLC,  and resides in the Middle District of Florida.

## DEFENDANT: MIHIR TANEJA

12.     Mihir Taneja is a manager for KERSDALE HOLDINGS, LLC, and BELCHER

PHARMACEUTICALS, LLC and resides in the Middle District of Florida.

## DEFENDANT: JUGAL TANEJA

13.     Jugal Taneja is a manager for BELCHER PHARMACEUTICALS, LLC and resides in the

Middle District of Florida.

## DEFENDANT: BELCHER PHARMACEUTICALS, LLC

14.     BELCHER PHARMACEUTICALS, LLC is located at 6911 Bryan Dairy Road, Ste. 210,

Largo, Florida, 33777.  Corporate records indicate that three of the company's managers

are also managers for CPN.  All of the managers are members of the Taneja family.

According to the company's website it "is a specialty pharmaceutical company focused on

the development and manufacturing prescription products to both human and animal

health markets. Belcher is committed to bringing quality, affordable products to customers and patients. We provide a diverse range of manufacturing services for the pharmaceutical industry." www.belcherpharma.com  The company is registered on the FDA's website as the manufacturer of Nuvagen Collagen Powder. www.fda.org

## DEFENDANT: J. DAWES

15.    James Dawes ███████████████████████████████████ Mr. Dawes is the president and founder of J. Dawes Group.  Mr. Dawes holds a bachelor's degree in economics and a bachelor's degree in physiology, both from Oklahoma State University. He is board certified by the American College of Medical Practice Executives (ACMPE), and earned a master's degree in health care administration from the University of Missouri-Columbia. Mr. Dawes has achieved the status of Certified Ophthalmic Executive (COE) by the American Society of Ophthalmic Administrators, and obtained Candidate stat.us with the Certified Commercial Investment Member Designee (CCIM). He resides in Sarasota, Florida. www.jdawesgroup.com.

## DEFENDANT: J. DAWES GROUP

16.    The J. Dawes Group is an inactive Florida corporation that is still doing business at 1990 Main Street, Suite 750 Sarasota, FL 34236. According to their website, the company provides the following services: "Lifestyle Medicine Services Development including Refractive Cataract, Laser Vision Correction, Presbyopia Treatment, Optical, Cosmetic and Plastic Surgery, Dermatology, Aesthetics and Skin Care Products and Services, Ambulatory Surgical Center (ASC) and In-office Surgical Suite Development, Surgeon, Physician and

Management Recruitment, Succession Planning, Retention and Training, Valuation and

Acquisition, Business Development, Marketing and Expansion Multi-Media Patient

Education and Marketing Material Creation" www.jdawesgroup.com.

DEFENDANTS: UNKNOWN CO-CONSPIRATORS

17.     Given the scope and gravity of the violations, the Relator may discover additional

parties and will seek leave to amend his complaint to add them as defendants.

STATUTORY AND REGULATORY BACKGROUND

The Federal Civil False Claims Act

18.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the

False Claims Amendments Act to facilitate enforcement and recovery by the United States

and to encourage private enforcement by qui tam plaintiffs (often referred to as

"relators"). Under the version of the FCA adopted by the False Claims Amendments Act,

liability is imposed on any person who:

        a.      knowingly presents, or causes to be presented, to an officer or employee of
the United States Government a false or fraudulent claim for payment or approval;

        b.      knowingly makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by the Government;

        c.      conspires to defraud the Government by getting a false or fraudulent claim
allowed or paid; or

        d.      knowingly makes, uses. or causes to be made or used, a false record or
statement to conceal, avoid, or decrease an obligation to pay or transmit money or
property to the Government. See 31U.S.C.§3729(a)(l), (2), (3) and (7).

19.     On May 20, 2009, the FCA was again amended pursuant to the Fraud Enforcement

and Recovery Act of 2009 ("FERA"). A person is liable for violation of the FCA, as amended

by FERA, if the person:

      a.    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

      b.    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

      c.    conspires to commit a violation of 31U.S.C.§3729(a)(l); or

      d.    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. See 31 U.S.C. § 3729(a)(l)(A), (8), (C) and (G).

20.    For purposes of the FCA, as amended by FERA, "knowing" or "knowingly" means that the defendant "(i) has actual knowledge of the falsity of the [relevant] information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(l )(A). No proof of specific intent to defraud is required. Id.

21.    The word "'material" is defined under the FCA, as amended by FERA, as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

22.    The FCA, as amended by FERA, further provides that liability under the act shall include '·a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by theFederal Civil Penalties Inflation Adjustment Act of 1990 ... [for each unlawful act], plus 3 times the amount of the damages which the Government sustains because of the act .... " See 31 U.S.C. § 3729(a)(l).

## The Federal Anti-Kickback Statute

23.     The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will improperly and adversely affect the decision about who is the optimal health care provider for a given situation, and results in the provisions of goods and services that are medically unnecessary, or poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against payment of kickbacks in any form, regardless if the particular kickback annually gives rise to overutilization or poor quality of care.

24.     The Federal Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7(b). Under this statute, health care companies may not offer or pay and sources of patient referrals may not solicit or receive any remuneration that is intended to induce the purchase, order or recommendation of any good, facility, service or item that may be paid for, in whole or in part, by a federal health care program. The law thus prohibits any kind of payment by CPN to a health care provider, in cash or kind, which has as one of the purposes for the inducement to the Relator and other health care provider to purchase Nuvagen Collagen Powder.

25.     The statute defines impermissible "payments" broadly as: "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b).   A Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320n-7(h), 1320u-7n(a)(7). These monetary penalties may be up to $10,000 for each act in violation of the Anti-Kickback Statute and damages of up to three times the amount of the remuneration offered or paid. 42 U.S.C. § 1320a-7(b). Compliance with the Anti-Kickback Statute is a precondition to participant as a health care provider under Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, Veteran's Administration-funded health insurance programs, Medicare Part D Plans and other government funded health insurance programs. Such compliance is also a precondition for payment under these programs.

26.     The federal Anti-Kickback Statute contains an exception for discounts that may be applicable to an arrangement between a DME supplier and a manufacturer. 42 U.S.C. § 1320a-7b(b)(3)(A). The exception protects "a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program." The requirements for immunity for discount arrangements are further enumerated in the federal safe harbor regulations but must be precisely followed. 42 C.F.R. § 1001.952(h).

<u>The Stark Act</u>

27. Title 42 U.S.C. § 1395nn (commonly known as the "Stark Act") prohibits hospitals and certain other designated health services (OHS) providing healthcare items and services from submitting Medicare claims for payment for items and services that are the product of patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital or DHS. The Stark Act requires that the Medicare program deny payment for claims for any service billed in violation of its provisions. 42 U.S.C. § 1395nn(g). In addition, it requires that providers who have collected Medicare payments for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353. The Stark Act establishes the presumptive rule that providers may not bill and the Medicare program will not pay for designated health services (as defined in the statute) generated by a referral from a physician with whom the provider has a financial relationship.

42 U.S.C. §§ 1395nn(a)( I ),(g)( I). The Act was designed to protect the federal healthcare programs from paying for the costs of questionable utilization of services by removing monetary influences on referral decisions.

28. In pertinent part, the Stark Act provides as follows:

(a)     Prohibition of certain referrals

(I)     In general
Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then-

(A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(8)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).
42 U.S.C. §§ 1395nn.

29.     The Stark Act broadly defines covered financial relationships to include any form of "compensation" paid directly or indirectly to a referring physician. 42 U.S.C. § 1395nn(a)(2).[1] Hospitals are prohibited from billing the Medicare program for designated health services provided to patients referred by a physician with whom the hospital has a financial relationship or "compensation arrangement," unless an express statutory or regulatory exception for the financial relationship applies. 42 U.S.C. §§ 1395nn(a),(b). Compensation arrangements include any arrangement involving any remuneration between a physician and an entity, directly or indirectly, overtly or covertly, in cash as well as in-kind transfers of benefits for a cost other than at fair market value. Most of the exceptions under the Stark Act parallel the regulatory and statutory exceptions to the Anti-Kickback Statute. 42 C.F.R. § 1001.952

---

[1] An indirect financial relationship exists if, inter alia, there is an indirect compensation arrangement between the referring physician and an entity that furnishes services and the referring physician receives aggregate compensation that "varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing" services. 42 C.F.R. § 41 J.354(c)(2)(ii). Such an arrangement requires an "unbroken chain" between the referring physician and the entity furnishing the services, and the entity must have knowledge or act in reckless disregard of the fact that the physician receives compensation that varies with or takes into account the volume or value of referrals. 42 C.F.R. § 41J.354(c)(2).

30.     The final clarification of the Stark Act is called the "Phase III" rule which was released by the Centers for Medicare & Medicaid Services (CMS) in 2007. <u>Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships ("Phase III")</u>, 72 FR 51012, September 5, 2007. The rule restricts physicians from providing durable medical equipment (DME) to their patients. Title 42 U.S.C. § 1395nn  This conduct is considered a prohibited referral and violation of the Stark Act unless a narrow exception applies or the physician is a DME provider.  The CMS addressed physicians attempting to become DME providers in the Phase III rule, "[t]here are few, if any, situations in which a referring physician would personally furnish DME and supplies to a patient, because doing so would require that the physician himself or herself be enrolled in Medicare as a DME supplier and personally perform all of the duties of a supplier as set forth in the supplier standards ..." Phase III clarifies that the enrollment requirements and professional supplier standards are not waived when a physician provides DME to a patient. CMS notes that in order to meet the DME supplier standards, a physician would, in part, be required to: personally, fit the DME (as needed); provide necessary information and instructions regarding use of the DME; advise the patient that the item may be rented or purchased; explain purchase options and all warranties; and deliver the DME to the patient. Moreover, a referring physician claiming to personally provide DME would need to maintain adequate documentation to demonstrate that the all of the provider standards were met. CMS notes that all of the supplier requirements would need to be

satisfied in order for a physician to supply DME without it constituting a referral under the Stark Law.

31.     Phase III also clarified that any exceptions or compensation arrangements cannot run afoul of the violate the Anti-Kickback Statute (section 1128B(b) of the Act; 42 U.S.C. 1320a–7b(b). "Inclusion of the anti-kickback statute condition is necessary to ensure that the exceptions promulgated under that authority do not pose a risk of program or patient abuse. Moreover, because parties' arrangements must not violate the anti-kickback statute irrespective of whether they satisfy the other requirements of an exception..." 72 F.R. 5013

### The Florida False Claims Act

32.     Like the FCA, the Florida False Claims Act Fla. Stat. A11n. § 68.081 et seq. ("FL FCA"), is generally designed to allow it to recover damages sustained as a result of False Claims made, used, presented, or caused to be made, used, or presented, by a defendant.

33.     The Florida False Claims Act, The State Acts are implicated when False Claims are made, used, presented, or caused to be made, used, or presented, to Government Health Programs funded in whole or in part by the States, including, but not limited to, Medicaid. Among other things, the FL FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to an officer or employee of the State of Florida is liable for a civil penalty ranging from $5,500 up to $11,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Florida.

34.     Under the FL FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state. The FL FCA further provides for liability for those who conspire to commit a violation of the Act.

## Medicare

35.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 - 1395ggg, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. The Secretary of HHS administers the Medicare program through CMS, a component of HHS. The Medicare program is comprised of four parts: Parts A, B, C, and D. Medicare Part A, the Basic Plan or Hospital Insurance covers costs of inpatient hospital services. Medicare Part B helps cover the cost of doctor's services, Durable Medical Equipment (DME), outpatient cure, as well as other medical services not covered by Part A. Medicare Part D helps cover patients' prescription drug costs.

36.     Medicare is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals, who are age 65 or older, or disabled, may enroll in Medicare to obtain treatment in return for payments of monthly premiums as established by HHS. However, payments under the Medicare Program are often made directly to service providers rather than to the patient (the "beneficiary"). This occurs when the provider accepts assignment of the right to

39.     All healthcare providers, including laboratories, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part B. A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following:

    a.      Medicare covers only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A); and

    b.      Providing economical medical services, and then, only when, and to the extent, medically necessary. 42 U.S.C. § 1320c-5(a)(1).

40.     In order to bill the Medicare Program, a provider must submit an electronic or

payment from the beneficiary. In that case, the provider submits its bill directly to Medicare for payment.

37.     The United States provides reimbursement for Medicare claims through the Centers for Medicare and Medicaid Services ("CMS"). CMS, in turn, contracts with private insurance carriers to administer, process and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the "Part B Trust Fund"). In this capacity, the carriers act on behalf of CMS.

38.     The Medicare Program, through the Part B Carrier, pays a significant portion of every claim. The Medicare beneficiary, or his or her supplemental insurance carrier, is required to pay the balance owed the provider. The beneficiary's payment is sometimes referred to as a "co-pay." Beneficiaries also pay deductibles.

39.     All healthcare providers, including laboratories, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part B. A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following:

     a.     Medicare covers only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A); and

     b.     Providing economical medical services, and then, only when, and to the extent, medically necessary. 42 U.S.C. § 1320c-5(a)(1).

40.     In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called the CMS 1500 Form with the following certification:

SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise permitted by Medicare or CHAMPUS Regulations.

Medicaid

41.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396-96v, is a system of medical assistance for indigent individuals. Though federally created, the Medicaid Program is a joint federal-state program in which the United States provides a significant share of funding. The Medicaid Program in the state of Florida covers, among other things, the cost of physician services.

42.     CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels, and administrative and operation procedures. The state pays healthcare providers directly with the state obtaining the federal share of the payment from accounts that draw on funds from the United States Treasury. 42 C.F.R. §§ 430.0-430.30. The Secretary of HHS determines each state's federal share of most healthcare costs using a formula based on average state per capita income compared to the national U.S. average. These matching rates are updated every year to reflect changes in average income.

43.     Federal law requires that a state's Medicaid plan "provide such methods and procedures . . . as may be necessary to safeguard against unnecessary utilization of . . . services and to assure that payments are consistent with efficiency, economy and quality of care."  42 U.S.C. § 1396a(a)(30).

44.     Medicaid reimburses generally services provided by nurse practitioners or

physician assistants in Florida at eighty percent (80%) of the reimbursement that would

be provided to a physician who provides the same services.  Fla. Stat. §§ 409.905(1);

409.906(18).

In order to bill the Medicare Program, a provider must submit the CMS Form 1500 with

the following certification:

MEDICAID PAYMENTS (PROVIDER CERTIFICATION)
SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were
medically indicated and necessary to the health of the patient and were personally
furnished by me or my employee under my personal direction.
NOTICE: This is to certify that the foregoing information is true, accurate and complete. I
understand that payment and satisfaction of this claim will be from Federal and State
funds, and that any false claims, statements, or documents, or concealment of a material
fact, may be prosecuted under applicable Federal or State laws.


## CHAMPUS/TRICARE

45.     In 1967, the Department of Defense created the Civilian Health and Medical

Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical

program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active

military personnel, retired personnel, and dependents of both active and retired

personnel.  In 1995, the Department of Defense established TRICARE, a managed

healthcare program, which operates as a supplement to CHAMPUS. See 32 C.F.R. §§

199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are

frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose

of the TRICARE program is to improve healthcare services to beneficiaries by creating

"managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. §199.17(a)(1). The TRICARE Management Activity ("TMA") oversaw this program until October 1, 2013, at which point the Defense Health Agency ("DHA") became responsible for TRICARE's oversight.

46. The TRICARE managed healthcare programs are created through contracts with managed care contractors in three geographic regions: North, South, and West. The Defendants serve patients in the South TRICARE region. TRICARE health services are provided through both network, and non-network, participating providers. Providers who are Medicare-certified providers are also considered TRICARE-authorized providers. TRICARE-authorized providers are either "Network Providers" or "Non-Network Providers."

47. "Network Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals, all of whom enter into an agreement with the region's managed care contractor, and provide services for an agreed reimbursement rate. 32 C.F.R. § 199.14(a). "Non-Network Participating Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals who do not enter an agreement with the region's managed care provider, and are reimbursed at rates established by TRICARE regulations.

48. The TRICARE managed care contractor for the Region where ASSOCIATES's offices are located is Military Healthcare Services, Inc. This contractor currently lists ASSOCIATES' physicians as Network Providers. To obtain status as a TRICARE Network Provider,

ASSOCIATES signed a contract with these managed care contractors accepting payment at TRICARE's pre-negotiated rates.

49.     Under TRICARE's billing requirements, the allowable charge for services rendered by a physician's assistant or nurse practitioner generally may not exceed 85% of the allowable charge for a comparable service rendered by a physician.  See TRICARE Reimbursement Manual, at Ch. 1, § 6.

50.     Moreover, as with Medicare and Medicaid, TRICARE's governing regulations require that services be "furnished at the appropriate level and only when and to the extent medically necessary," and that such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. 199.6(a)(5). As such, services provided at a level higher than the medically necessary are improper and violations of TRICARE.

51.     TRICARE prohibits practices such as submitting claims for services which are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records.  32 C.F.R. §§ 199.9(b)(3)-(b)(5). Such practices are deemed abusive and cause financial loss to the United States.  32 C.F.R. §§ 199.9(b).

## BACKGROUND AND ALLEGATIONS

### Nuvagen Collagen Powder

52.    In the summer of 2017, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

53.    The item was Nuvagen Collagen Powder (hereinafter "the Powder"),  a hydrophilic

wound dressing and an item of Durable Medical Equipment (DME) under the federal

health care regulations.[2]   According to the Food and Drug Administration's website, the

powder is manufactured by Belcher Pharmaceuticals, LLC, 12393 Belcher Road, Suite 420,

Largo, Florida, 33773.  It is approved by the Food and Drug Administration and Medicare

as a dressing for a medically necessary surgery or surgically treated wounds.

www.medicare.gov.  **(Exhibit A, Defendant's Promotional Materials for Nuvagen**

**Collagen Powder attached).**

---

[2] Hydrophilic wound dressing.
(a) Identification. A hydrophilic wound dressing is a sterile or nonsterile device intended to cover a wound and to absorb exudate. It consists
of nonresorbable materials with hydrophilic properties that are capable of absorbing exudate (e.g., cotton, cotton derivatives, alginates, dextran, and rayon). This classification does not include a hydrophilic wound dressing that contains added drugs such as antimicrobial agents, added biologics such as growth factors, or is composed of materials derived from animal sources.
21 C.F.R. 878.4018

<u>Application of the Nuvagen Collagen Powder Is Not Medically Necessary</u>

54. 

55. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ It was

their opinion that application of collagen powder on small acute wounds so that they

possibly could heal faster was improper and likely off label use.[3]

<u>Punch Biopsies</u>

56. ████████████████████████████████████████ A

punch biopsy is a medical procedure that acquires tissue for laboratory examination,

usually through tissue culture or microscopy, by taking a punch-size piece of skin from the

---

[3] Off label use means prescribing a drug or DME for an ailment or procedure not approved by the FDA.

body. Small pieces of skin from any part of the body are removed using a tube-shaped tool. It has a blade, which ranges in size from 1 mm to 8 mm. It is rotated through the skin to the subcutaneous fat. The specimens obtained are sent for microscopic and histopathological examination, or bacterial and/ or viral cultures. It is a relatively low-risk procedure that is typically done under local anesthesia and completed in about 15 minutes. Patients can return to their normal lives almost immediately and there is little chance of infection. For most punch biopsies, the Relator just covers the wound with a bandage, sterile dressing and applies Aquaphor or a similar over-the counter product cream. This is the established wound care for punch biopsies. Dermatologist make almost no profit and Medicare is charged very little for this type of wound care.

Mohs Surgery

57.　██████████████████████████████████ Mohs surgery is a precise surgical technique used to treat skin cancer. During Mohs surgery, thin layers of cancer-containing skin are progressively removed and examined until only cancer-free tissue remains. Mohs surgery is also known as Mohs micrographic surgery. The goal of Mohs surgery is to remove as much of the skin cancer as possible, while doing minimal damage to surrounding healthy tissue. Mohs surgery is usually done on an outpatient basis using a local anesthetic.

58.　Mohs surgery is an improvement to standard surgery (local excision), which involves removing the visible cancer and a small margin of surrounding healthy tissue all at once. Mohs surgery allows surgeons to verify that all cancer cells have been removed

at the time of surgery. This increases the chance of a cure and reduces the need for

additional treatments or additional surgery. www.mayoclinic.org

Significant Profits to Dermatologist Prescribing Nuvagen Collagen Powder

59.     In promotional materials forwarded to the Relator, CPN disclosed that it charges

$34.48 for each gram of Nuvagen Collagen Powder.  The product costs $18.94 per gram

and the profits for CPN and physicians prescribing the powder are significant.  For

example, CPN charges Medicare $482.72 for 14 grams which is a 14-day supply of the

powder.  After the actual cost of the powder, $265.16, is subtracted, the net

disbursement is $174.05 to the physician for each gram applied to each punch biopsy.

**(Exhibit B, pg. 13, CPN Biosciences PowerPoint Presentation, DME Reimbursement**

**Example)** The message from CPN in its promotional materials, e-mails, and texts to the

Relator is that he could get rich from prescribing the powder to his patients at the

expense of Medicare

60.     If a patient had multiple biopsies taken during a visit (which is very common) the

cost to Medicare and the doctor's profits multiplies.  CPN's representative, Defendant

Dawes, confirmed this scenario



Defendant Dawes told the Relator he will make substantial income from prescribing the powder and billing Medicare. ████████████████████████████

████████████████████████████████████████

████ Defendant Dawes predicted that the Relator would easily make over $400,000 in annual profit from prescribing the powder. ████████████████

████████████████████████████████████████████

████████████████████████████████████████

61.  ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████ the cost to Medicare would be $5.3 million ████████

████████ Compared to the cost of a Band-Aid and the topical gel that dermatologist normally apply after punch biopsies, these costs to our health care systems are staggering.

<u>Non-Collection of Patient's Co-Payment for Nuvagen Collagen Powder</u>

62.  ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

63. ████████████████████████████████████

████████████████████████████████████

████████████████████████████

64.     The Relator believed that the CPN's encouragement not to collect co-payments

was an illegal financial incentive to him and his patients. The Relator understood that by

not collecting co-payments, Medicare would lose 20% on each powder prescription. The

Relator also understood that patients who benefited from the non-collection of co-

payments would be incentivized to return for additional health care.   With each

additional visit, there was an opportunity for additional surgical procedures and

prescriptions for CPN's powder. Under this scheme,  CPN, the patient and the doctor

would all derive financial benefit.

Other non-Dermatologist Prescribing  Nuvagen Collagen Powder

65.     CPN's promotional materials touted the powder as "advanced wound care

therapy" and the "gold standard" for wound treatment in podiatry, vascular disease

management, orthopedics, plastic and reconstructive surgery. **Exhibit C, Advanced**

**Wound Care Therapy with CPN Biosciences).** ████████████████████████

████████████████████████████████████ CPN's

promotional materials predicted that the powder would soon be widely prescribed by

dermatologists. Defendant Dawes told the Relator that doctors in other specialties

doubled their annual income after implementing CPN's "system."

66.    Given the huge financial incentive and number of minor surgical wounds caused by dermatologists, the Relator believed that the risk for over-prescription of the powder and fraud was very high. The Relator also thought that while other medical specialist treating chronic wounds may have a legitimate medical reason to apply the powder, the same could not be said for surgical wounds caused by Mohs surgery or biopsies.

### CPN'S Targeting Dermatologist to Prescribe Nuvagen Collagen Powder

67.    Defendant Dawes communicated that CPN had not marketed the powder to dermatologist in the past, but was now doing so.



68.    Since the Relator had never heard of collagen powder used by dermatologist after routine and minor surgical injuries, he consulted representatives of companies with products like CPN's. The Relator was told that the collagen powder was limited to chronic wounds or for patients with difficult healing.

### CPN's Durable Medical Equipment (DME) Scheme

69.

70.    ██████████████████ a PowerPoint presentation explaining CPN's DME

provider system.  The PowerPoint presentation emphasized that doctors could make

significant amounts of money prescribing the powder as DME providers for CPN. One

slide questioned: "While physicians are allowed to be a DME provider, most are they

sending out their DME revenue to other third party DME's? **(Exhibit B, pg. 10, CPN**

**Biosciences PowerPoint Presentation, DME Reimbursement Example)** The next slide

showed the annual revenues for four DME providers that ranged from $2.4 million to

$190 billion. **(Exhibit B, pg. 11, CPN Biosciences PowerPoint Presentation, DME**

**Reimbursement Example).** The inference from CPN that doctors could make millions by

prescribing the powder at DEM providers.

71.    One slide entitled "How it Works" gave a 6-step explanation of how doctors could

prescribe the powder as DME providers.  Step 1: Order is e-Prescribed or Faxed to CPN.

Step 2: CPN does verification, eligibility, prior authorizations, etc. to facilitate order

reimbursement. Step 3: Orders covered by insurance are sent to warehouse to be picked

and packed custom to your order. Step 4: Orders are shipped to patients address

office/wound care center/nursing home. Step 5: Once delivery confirmation is achieved,

your facility may bill the insurance company. Step 6: CPN's software allows you to

manage your business in themost organized, detailed and compliant manner. **(Exhibit B,**

**pg. 12, CPN Biosciences PowerPoint Presentation, DME Reimbursement Example)**

72.     There were additional slides promoting CPN's ability to assist doctors with the

DME provider process to include upfront cost of inventory, storage space, packing

individual orders, compliance and billing. One slide was titled "How CPN can make DME

Opportunities Possible." **(Exhibit B, pg. 15, CPN Biosciences PowerPoint Presentation,**

**DME Reimbursement Example).** The slides show that CPN 's extensive involvement in

the DME provider process solely to put doctor's in a position to prescribe and order as

much powder as possible.

Free Inventory and Volume Discounts for the Purchase of Nuvagen Collagen Powder

73.     ████████████████████████████████████████

████████████████████████████ Defendant Dawes stated ████████

████████████████████████████████████████████████

████ Defendant Dawes also stated ████████████████████████

████████████████████ The PowerPoint presentation included a slide titled "DME

Reimbursement Example." The slide explained a scenario where Medicare is billed for the

powder. The slide involving specifies that the powder costs $18.94 per gram. There is an

asterisk above the price, with the following: "*note" volume discounts may reduce cost of

product."

74.     Defendant Dawes told the Relator that once he was a DME provider, ████████

████████████████████████████████████████████████

████████████ This is consistent with the CPN PowerPoint slide "How CPN Makes DME

Opportunities Possible." The slide has a one-hundred dollar bill and coins with the caption "Upfront Cost of Inventory" next to a building with a red cross with the caption "space required to operate." **(Exhibit B, pg. 15, CPN Biosciences PowerPoint Presentation, DME Reimbursement Example).**

75.     The Relator believed the free upfront inventory of the powder without repayment to CPN until after reimbursement from third-party providers was an improper incentive to prescribe more of the powder. He also believed that the volume discounts were given to doctors by CPN to encourage them to prescribe more powder. There was never any discussion of disclosure of the discounts to Medicare or Medicaid, or mention of the reporting requirements for both supplier and purchaser.

<u>DAMAGES TO THE UNITED STATES AND FLORIDA</u>

76.     To summarize, the Relator is revealing a number of practices by Defendants:

(a)     encouraging doctors to prescribe Nuvagen Collagen Powder for minor surgical injuries which is not medically necessary nor economically responsible to government healthcare providers like Medicare and Medicaid;

(b)     establishing a system whereby they facilitate and assist doctors to function as DME providers to make enormous profits from prescribing Nuvagen Collagen Powder;

(c)     encouraging doctors not to collect Medicare co-pays from patients to incentivize patients to return for additional treatment and Nuvagen Collagen Powder prescriptions ; and

(d)     providing free up-front inventory and discounts to doctors for the cost of Nuvagen Collagen Powder so that the doctors can increase their profits.

77.     Based on CPN's own promotional materials and the statements from Defendant Hawes, thousands of doctors have billed Medicare, Medicaid, and CHAMPUS/TRICARE for

CPN's powder. It can be inferred that the practices identified in paragraph 76 have been used by CPN since its inception in 2015 and are on-going. The profits for CPN, the doctors and cost to state and federal taxpayers may be in the hundreds of millions of dollars.

<u>CLAIMS FOR RELIEF</u>

FIRST CAUSE OF ACTION
Federal False Claims Act
31 U.S.C. § 3729(a)(l)
(As to all Defendants)

78.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(l). As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

SECOND CAUSE OF ACTION
Federal False Claims Act
31 U.S.C. § 3729(a)(l)(A)
(As to all Defendants)

79.    Relator repeats and incorporates by reference the allegations contained m the foregoing paragraphs of this Complaint as if fully set forth herein. Through the acts more particularly set forth m the foregoing paragraphs, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of

31 U.S.C. § 3729(a)(l)(A). As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
Federal False Claims Act
31 U.S.C. § 3729(a)(2)
(As to all Defendants)

80.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2). As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
Federal False Claims Act
31 U.S.C. § 3729(a)(l)(B)
(As to all Defendants)

81.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims within the meaning of 31 U.S.C. § 3729(a)(l)(B). As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(3)
### (As to all Defendants)

82. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid to in violation of 31 U.S.C. § 3729(a)(3). As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(I)(C)
### (As to all Defendants)

83. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to commit violations of the FCA within the meaning of 31 U.S.C. § 3729(a)( I )(C). As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(7)
### (As to all Defendants)

84.     Relator repeat and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease their obligations to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(7).

As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(l)(G)
### (As to all Defendants)

85.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements material to its obligations to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased their obligations to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)( I )(G).

Champus/Tricare. The Starke Act and Anti-Kickback Act are violated through these improper referrals and incentive system.

### TWELVE CAUSE OF ACTION
Florida False Claims Act
Fla. Stat. Ann.§§ 68.082(2)(a), (b), (c) and (g)
(As to All Defendants)

89.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein. This is a claim for treble damages and penalties under the FL FCA. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Florida State Government for payment or approval, in violation of Fla. Stat. Ann. § 68.082(2)(a).

90.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements,

and omitted material facts, to induce the Florida State Government to approve and pay false and fraudulent claims, in violation of Fla. Stat. Ann.§ 68.082(2)(b).

91.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Florida State Government by inducing it to approve and pay false and fraudulent claims, in violation of Fla. Stat. Ann.§ 68.082(2)(c). Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid,

or decrease obligations to pay or transmit money or property to the Florida State Government, in violation of Fla. Stat. Ann. § 68.082(2)(g).

92.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

93.     As a result of Defendants' conduct, the State of Florida has been damaged, and continues to be damaged, in an amount to be determined at trial. The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment against Defendants as follows:

(a)     That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. § 3729-33;

(b)     That judgment be entered in favor of the United States and Relators and against the  Defendants in the  amount of each and every false or fraudulent claim multiplied, as provided by 31 U.S.C. § 3729, plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500) Dollars, and not more than Eleven Thousand and No/100 ($11,000) Dollars per claim, as provided by 31 U.S.C. § 3729, to the extent such multiplied penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by the Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(c)     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

(d)     That judgment be granted for the United States and Relators for all violations by the Defendants of the False Claims Act;

(e)     That the United States and Relators recover any and all damages available to them as a result of Defendants' stated violations of the False Claims Act;

(f)     That judgment be granted for the United States and Relators and against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fee incurred by Relators in the prosecution of this case;

(g)     That the United States and Relators be granted such other and further relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Respectfully submitted this 25 day of July, 2017 by

DANIEL W. ECKHART, ESQUIRE
Florida Bar No.: 488674

DAN ECKHART LAW
www.daneckhartlaw.com
4767 New Broad Street
Orlando, Florida 32814
Telephone: (407) 514-2766
Mobile: (352) 255-5004
Facsimile: (407) 514-2604
Attorneys for Plaintiff
Emails for service:
dan@daneckhartlaw.com